## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **NOEL MONTES SOSA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. CIV-15-827-W** |
| | ) | |
| **ROBERT PATTON,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

Petitioner Noel Sosa, a state prisoner appearing *pro se*, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1) (Petition), challenging the constitutionality of his state court conviction. Respondent has filed his Response to Petition for Writ of Habeas Corpus, (ECF No. 13) (Response). For the reasons set forth below, it is recommended that the Petition be **DENIED**.

## I.    FACTUAL BACKGROUND

On July 10, 2011, Sarita Aguilar was choked to death. At that time, the victim and Petitioner lived together, along with the victim's three children, including then 7-year-old M.A. Upon arriving at the scene, police officers arrested Mr. Sosa for the crime and took the victim's children to the home of their grandmother, Billie Aguilar (Ms. Aguilar). M.A. made statements to her grandmother which implicated Mr. Sosa as the individual who had killed her mother. Over a year later, M.A. was the subject of a

forensic interview, wherein she made additional statements regarding the events which occurred the night her mother died.

At trial, Ms. Aguilar testified regarding what her granddaughter told her concerning the details of the events surrounding her mother's death. Over defense counsel's objection, the testimony was admitted under Oklahoma's "excited utterances" hearsay exception. The jury also heard testimony from the victim's sister regarding an argument which occurred between Mr. Sosa and the victim approximately two weeks before the crime. Defense counsel chose not to introduce the videotape of the forensic interview.

## II.    PROCEDURAL BACKGROUND AND ISSUES PRESENTED

On January 23, 2013, Petitioner was convicted of first-degree murder. (ECF No. 1:1). Following the conviction, Mr. Sosa filed a direct appeal. (ECF No. 1-1) (Brief of Appellant). There, Mr. Sosa alleged:

1.    The trial court violated Oklahoma law and the Sixth Amendment by admitting the statements of M.A. that she had made to her grandmother hours after the crime;

2.    Ineffective assistance of trial counsel for failing to introduce the videotaped forensic interview of M.A.; and

3.    The trial court erred in admitting irrelevant and prejudicial evidence of "other crimes, wrongs, or acts."

(ECF No. 1-1). On May 7, 2014, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's conviction. (ECF No. 13-4) (OCCA Summary Opinion). On July 29, 2015, Mr. Sosa timely filed his habeas petition. (ECF No. 1). As grounds for habeas relief, Petitioner solely references his direct appeal brief which he attaches as Exhibit 1. *See* ECF No. 1:6, 7, 9; 1-1.

## III.   STANDARD OF REVIEW

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), this Court's power to grant habeas corpus relief to state prisoners is limited. *Snow v. Sirmons,* 474 F.3d 693, 696 (10th Cir. 2007). Under the AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. *Alverson v. Workman,* 595 F.3d 1142, 1146 (10th Cir. 2010) (citing *Snow,* 474 F.3d at 696). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter,* 562 U.S. 86, 98 (2011).

Under the AEDPA, a petitioner is entitled to federal habeas relief only if the merits-based adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster,* 563 U.S. 170, (2011). "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. "It is the petitioner's burden to make this showing and it is a burden intentionally designed to be 'difficult to meet.'" *Owens v. Trammell*, 792 F.3d 1234, 1242 (10th Cir. 2015) (citation omitted).

This Court first determines "whether the petitioner's claim is based on clearly established federal law, focusing exclusively on Supreme Court decisions." *Hanson v. Sherrod*, 797 F.3d 810, 824 (10th Cir. 2015). "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of [the United States Supreme Court.]" *Thaler v. Haynes*, 531 U.S. 43, 47 (2010). If clearly established federal law exists, this Court then considers whether the state court decision was contrary to or an unreasonable application of clearly established federal law. *See Owens,* 792 F.3d at 1242.

"A state court's decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts.'" *Id.* (citations omitted). Notably, "'[i]t is not

enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself.'" *Id.* (citation omitted).

The "'unreasonable application' prong requires [the petitioner to prove] that the state court 'identified the correct governing legal principle from Supreme Court decisions but unreasonably applied that principle to the facts of the prisoner's case.'" *Id.* (citations and internal brackets omitted). On this point, "the relevant inquiry is not whether the state court's application of federal law was *incorrect*, but whether it was 'objectively unreasonable.'" *Id.* (citations omitted, emphasis in original). So, to qualify for habeas relief on this prong, a petitioner must show "'there was no reasonable basis' for the state court's determination."' *Id.* at 1242-43 (citation omitted).

In sum, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington,* 562 U.S. at 101–02 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102. The deference embodied in § 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the

state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citation omitted).

## IV.  ADMISSION OF STATEMENTS MADE BY THE VICTIM'S DAUGHTER TO HER GRANDMOTHER

In Ground Three, Petitioner challenges the trial court's admission of testimony from the victim's mother, Ms. Aguilar, as: (1) improperly admitted under the "excited utterances" exception to the hearsay rule and (2) a violation of the Confrontation Clause of the Sixth Amendment. (ECF No. 1-1:24-34).[1]

### A.  The Contested Testimony

At trial, the victim's mother, Ms. Aguilar, testified regarding statements made to her by the victim's daughter, M.A. Ms. Aguilar stated that on the morning of the murder, police arrived at her residence with three of the victim's children, including M.A., who had been living with their mother. Transcript of the Jury Trial Proceedings had on the 12th day of December, 2012 Before the Honorable Ray C. Elliot, *State of Oklahoma v. Sosa*, Case No. CF-2011-4010 (Okla. Co. Dec. 12, 2012) Vol. III at 24-26 (Trial TR. Vol. III). The officers gave custody of the children to Ms. Aguilar and then

---

[1]  In his brief, Mr. Sosa cites the Confrontation Clause of the Sixth Amendment and then states that he "was unable to confront the central witness against him, [M.A.], because (1) her statements were admitted through her grandmother under an exception to the hearsay rule, and (2) [M.A.] did not testify at trial." (ECF No. 1-1:24-25). At first glance, it appears as though Mr. Sosa is arguing two violations of the Confrontation Clause. However, his subsequent statements and argument clarify otherwise. Petitioner's first argument merely presents a challenge to the trial court's admissibility of the testimony as improper hearsay under Oklahoma law. *See* ECF No. 1-1:31 ("Confrontation Clause analysis aside, [M.A.'s] statements were generally inadmissible under the hearsay rule."). But the second argument clearly presents a Sixth Amendment claim. *See* ECF No. 1-1:35 ("Regardless of the statements' admissibility as hearsay, the statements were inadmissible under the Confrontation Clause.").

left. (Trial TR. Vol. III 26-27). Alone with the three children, Ms. Aguilar asked M.A. if she was okay. (Trial TR. Vol. III 28). In response, Ms. Aguilar testified that M.A. started crying and telling her what happened, stating that "her mommy was dead" and that Petitioner "was choking her mommy." (Trial TR. Vol. III 28-29). M.A. told her grandmother that she had hit Mr. Sosa on the arm and "asked him to stop, stop, stop, why are you doing this." (Trial TR. Vol. III 29). In response, M.A. told Ms. Aguilar that Mr. Sosa said, "she's dying anyway, I got to kill her." (Trial TR. Vol. III 29).

At one point during the incident, M.A. was screaming at Petitioner and he went outside. (Trial TR. Vol. III 31). While Mr. Sosa was outside, M.A. asked her mother if she was ok. (Trial TR. Vol. III 31). At first, her mother did not respond, but then she opened her eyes, which M.A. described as being "like blood," and said, "[M]ama's going to heaven now. And when you guys die you're going to come to heaven too." (Trial TR. Vol. III 31).

While the victim was talking, Petitioner came back into the room and continued to choke her, at which point M.A. told her grandmother "my mommy was dead." (Trial TR. Vol. III 31). Ms. Aguilar testified that the entire time M.A. had relayed the details of the events, she had been hyperventilating and crying. (Trial TR. Vol. III 32). The trial court admitted Ms. Aguilar's testimony under the "excited utterances" exception to the hearsay rule. *See* 12 O.S. § 2803(2); Transcript of the Pretrial Motion Proceedings had on the 4th day of December, 2012 Before the Honorable Ray C. Elliot, *State of*

*Oklahoma v. Sosa*, Case No. CF-2011-4010 (Okla. Co. Dec. 4, 2012) at 104 (Pretrial TR. 104); (Trial TR. Vol. III 64).

### B. The Statements Did Not Render the Trial Fundamentally Unfair

As stated, Mr. Sosa contends that Ms. Aguilar's testimony was improperly admitted under the "excited utterances" exception to the hearsay rule under Oklahoma law. The OCCA rejected this argument, stating:

> Whether a statement qualifies as an excited utterance depends not on a fixed time but on the facts and circumstances of each case. . . . The record shows the child declarant was still under the immediate stress of the startling event, made the statement to the first adult she saw whom she knew since the event occurred, and was overcome by strong emotion during the statement. The trial court did not abuse its discretion in admitting the statement as an excited utterance.

(ECF No. 13-4:5-6) (internal citations and quotation marks omitted). The OCCA's decision was reasonable.

As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence . . . ." *Moore v. Marr,* 254 F.3d 1235, 1246 (10th Cir. 2001) (internal citations omitted). Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court on habeas review will not disturb the state court's evidentiary ruling unless it was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir.2000) (quoting *Williamson v. Ward,* 110 F.3d 1508, 1522 (10th Cir.1997).

Under Oklahoma law, hearsay is admissible as an "excited utterance" if the statement relates to a startling event or condition and was made while the declarant was under the stress of excitement caused by the event or condition. *See* 12 O.S. § 2803(2). Mr. Sosa argues that because of the seven-hour time delay between the murder and when M.A. made the statements to her grandmother, the statements do not qualify as "excited utterances." According to Petitioner, the time delay allowed "too many opportunities for fabrication" and for [M.A.] to "glean information from the adults around her." (ECF No. 1-1:34-35). Furthermore, Petitioner claims that when M.A. arrived at her grandmother's home, she was "very calm" and had not relayed the contested statements to other adults, even when given the opportunity. (ECF No. 1-1:35).

The OCCA concluded that M.A.'s statements were properly admitted as "excited utterances," relying heavily on *Marquez v. State*, 890 P.2d 980 (Okla. Ct. Crim. App. Feb. 28, 1995). In *Marquez*, a child had been present during the murder of her parents and had seen the assailant. *Marquez*, at 983. The child then slept and the next morning made statements describing the assailant. *Id.* On appeal, the issue was whether the child's statements had been properly admitted under the "excited utterances" exception to the hearsay rule.

The OCCA stated that the murder of the child's parents was obviously a startling event, and her statements clearly related to that event. *Id.* at 983. Thus, the question was whether the statements were made while she was still under the stress or

excitement of the event. *Id.* The appellate court answered this question affirmatively, stating that when the child made the statements, she was "just beginning to understand the fact that her parents were dead" and "the record [did] not contain evidence which would indicate [the child] had an incentive to falsely report what she saw." *Id.* Finally, Marquez stated that the excited utterances determination "is a factual analysis which must be done on a case by case basis." *Id.* at 984.

Like in *Marquez*, the record here shows that M.A. made the statements to her grandmother while still under the stress of witnessing the choking death of her mother only hours earlier. Although M.A. might have been calm when she arrived at her grandmother's home, she immediately became hysterical after her grandmother asked if she was okay, crying and hyperventilating while relaying the details of her mother's death. Although several hours had passed, by the time she spoke to her grandmother, M.A. was just beginning to understand the impact of her mother's death. Under the circumstances, it is reasonable to conclude that M.A.'s stress following the murder would last several hours. *See United States v. King*, 2000 WL 1028228, at 4 (10th Cir. July 26, 2000) (unpublished op.) ("[t]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance."). And like in *Marquez*, the record contains nothing which would indicate that M.A. had any motive to fabricate the events or had otherwise been influenced by anyone else to make the statements.

Petitioner has not shown that the state court error of which he complains fatally infected the trial and "deprived him of fundamental rights guaranteed by the Constitution of the United States." *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998) (internal quotation omitted). The OCCA's decision to allow M.A.'s statements under the "excited utterances" exception was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or an unreasonable determination of the facts in light of the evidence presented at trial. Consequently, Petitioner is not entitled to habeas relief as to this claim.

### C.     No Violation of the Confrontation Clause

Alternatively, Mr. Sosa argues that the admission of M.A.'s statements through Ms. Aguilar's testimony violated his right of confrontation under the Sixth Amendment. The OCCA rejected the argument, stating that under *Crawford v. Washington*, 541 U.S. 36 (2004), the Confrontation Clause was not implicated because the statements were not "testimonial" in nature. (ECF No. 13-4:6-7). Citing *Michigan v. Bryant*, __ U.S. __, 131 S.Ct. 1143, 1155 (2011), the OCCA also stated that "in determining whether a statement is testimonial, we ask the primary purpose of the interrogation." (ECF No. 13-4: 6-7). In the instant case, the court found that "there was no formal interrogation and no state actor was involved; the child responded to a question from her grandmother about her personal welfare. *Crawford* does not apply, and there was no Confrontation Clause violation." (ECF No. 13-4:6-7). The OCCA correctly interpreted Supreme Court law and applied the law accurately to the facts of the case.

The Sixth Amendment of the United States Constitution guarantees an individual accused of a criminal offense the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is shown to be unavailable and the defendant had an earlier opportunity to cross-examine the declarant. *Id.* at 51-52.

The *Crawford* Court declined to precisely define "testimonial" hearsay. *See id.*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). Nonetheless, the Court did provide "relevant guideposts to frame [the] analysis." *United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005). The Court determined that, at a minimum, testimonial hearsay includes "prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

The Supreme Court provided additional guidance as to what constitutes testimonial hearsay in *Davis v. Washington*, __ U.S. __, 126 S. Ct. 2266 (2006). In *Davis*, the Court applied an objective test to determine whether a police interrogation that took place in the course of a 911 call produced testimonial statements. The Court concluded the circumstances of the interrogation indicated that the "primary purpose" of the witness's interrogation was "to enable police assistance to meet an ongoing emergency." *Davis*, 126 S.Ct. at 2277. Therefore, the statements were not testimonial. *Id.*

In *Davis,* the Court made express what was suggested in *Crawford:* the Confrontation Clause applies only to testimonial hearsay. *Id.* at 2274. The admission of non-testimonial hearsay statements, therefore, does not present a Confrontation Clause violation. *See, e.g., United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006) ("The Supreme Court . . . in *Davis* made clear that the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements.") *citing Davis*, 126 S. Ct. at 2274. *Davis* concluded that "statements made unwittingly to a Government informant" and "statements from one prisoner to another" are examples of "clearly nontestimonial" statements. *Id.* at 2275 (*citing Bourjaily v. United States*, 483 U.S. 171, 181-184 (1987) and *Dutton v. Evans*, 400 U.S. 74, 87-89 (1970) (plurality opinion)).

In *Michigan v. Bryant*, 562 U.S. 344 (2011), the Court gave further guidance in how to determine the "primary purpose" of the interrogation, which is instrumental in evaluating whether the statement qualifies as "testimonial." The Court explained:

> When, as in *Davis*, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause. But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.

*Michigan v. Bryant*, 562 U.S. at 358 (emphasis in original).

Here, the statements challenged by Petitioner are clearly not testimonial. As noted by the OCCA, the statements were made by M.A. to her grandmother in response to a question about the girl's personal welfare. Ms. Aguilar was not a police officer or in any way acting in any official capacity when she asked M.A. "if she was okay." In context, M.A.'s statements to Ms. Aguilar cannot give rise to any reasonable inference that she was acting as a *witness* or *testifying* or that what she said was akin to a "weaker substitute for live testimony at trial." *See Davis,* at 2277. The circumstances of the statements do not objectively indicate that the primary purpose of the statements was to establish or prove past events potentially relevant to later criminal prosecution. *Id.* at 2273-2274. Because the primary purpose of Ms. Aguilar's question to M.A. was not to secure testimony, the admissibility of the statements did not implicate the Confrontation Clause. *See Bryant*, at 358. Accordingly, Petitioner is not entitled to habeas relief on this ground.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

In Ground One, Mr. Sosa alleges ineffective assistance of counsel for failing to introduce evidence of a videotaped interview. (ECF No. 1-1:17-25). The interview contained statements from M.A. concerning the choking death of her mother which Petitioner claims contradict the child's statements which were admitted at trial through the testimony of her grandmother. In support, Mr. Sosa cites the following transcript excerpt from the interview.

Q:      When you lived with Mom, how did you feel?

A:      Not that good.

Q:      You didn't feel that good? Tell me about that.

A:      I think he killed her. [Indicating.]

Q:      You think he killed her? You pointed to Mom's boyfriend?

A:      [Nods.]

Q:      Tell me about that

A:      Um . . .

Q:      What makes you say that you think he killed her?

A:      Everybody says that.

Q:      Everybody says that? What do *you* think?

A:      [Shrugs.]

Q:      Is that something you saw happen with your eyes or something that you heard with your ears?

A:      I didn't hear anything or saw [sic] anything.

Q:      What do you think that he did that would have killed Mom?

A:      Choke her.

Q:      Okay. Tell me about that.

A:      I don't know.

Q:      What does that look like when somebody gets choked?

A:      I really don't know.

. . .


Q:      Have you seen him choke Mom before? Or was this something that you haven't seen before or something else?

A:      I don't think nothing like that.

Q:      Was there a time when you woke up when you were able to talk to mom? Or did you not talk to mom?

A:      It was only at night. I told her I love her, good night, and then I hugged her and I kissed her on the cheek and then we all went to bed and then I just woke up. And then . . .

Q:      What about after you woke up, were you able to talk to mom at all?

A:      Hmmm mmm.

Q:      Did you talk to mom's boyfriend after you woke up?

A:      He kept on screaming and stuff like that. Pushing stuff down. And everything else.

Q:      What was he screaming?

A:      [Shrugs.] I don't know if he did it or not.

Q:      What was he saying when he was screaming?

A:      He was saying "please Sarita wake up" and stuff like that.

Q:      Tell me about the stuff he was pushing down.

A: He was pushing the TV down. Um you know the [unintelligible]. He was pushing that down. He went upstairs, push everything off the dresser and everything.

Q: When he was saying "please Sarita wake up," was he saying something else or was that the only thing he was saying?

A: That's the only thing he was saying.

Q: You told me that you think he [indicates] did something to mom. What about these two people [indicates]

A: Hmmm mmm. They wouldn't do nothing like that.

Q: They wouldn't do something like that? Tell me about that.

A: Well they're nice and they wouldn't do nothing like that. And stuff, stuff like that.

Q: Have you seen, um, you told me about how mom's boyfriend slapping [sic] mom, choking mom. Was that something that these two people [indicates] would have done to mom?

A: I really don't know, I was sleeping.

Q: What do you think?

A: I don't know.

Q: What happened that made mom dead?

A: [Shrugs.] Well okay, my brother, um, gave her some pills. And the bottle was like maybe like that big [indicates.] And then like when we woke up it was maybe like half 'cause it like . . . the bottle was like to here [indicates]. And it was filled up to right here [indicates]. And then now it's down to here. And we don't know if it was her . . . she took those, or the other thing . . .

Q: And what was the other thing?

A: Um, choking.

Q: Choking. And you said that or him, who's "him"?

A: [Indicates.]

Q: Okay.

Q: Was there a time Marisela, when you, when you woke up, when you saw mom's boyfriend choking her?

A: Hmmm mmm.

Q: Did you not see him do that, or something else?

A: Hmmm mmm.

Q: Have you seen mom's boyfriend choke mom before?

A: [Shakes head no.]

Q: Did Mom's boyfriend say something to you about telling or not telling what happened to mom?

A: [Shakes head no.]

Q:      Has he said something to you that would make you worried or scared or
        confused?
A:      No.

(ECF No. 1-1:17-20).

On appeal, the OCCA rejected the claim, stating:

The record shows defense counsel was familiar with the interview and
chose not to use it. We will not second-guess strategic decisions. Sosa
fails to show that the outcome of his trial would have been different if
defense counsel had used the interview. Taken as a whole, the excerpt of
the interview Sosa cites in his brief is ambiguous and does not clearly
contradict the child witness's original statement, which was admitted. In
addition, evidence other than that original statement supported Sosa's
conviction.

(ECF No. 13-4:2-3).

As noted by the OCCA, the standard for proving ineffective assistance of counsel

was set forth in *Strickland v Washington*, 466 U.S. 668 (1984). To prevail on a claim of

ineffective assistance of counsel under *Strickland v. Washington*, the accused must

prove deficient performance and prejudice. *Strickland*, at 687. To prove deficiency, the

accused must overcome the strong presumption that counsel's conduct fell outside of

the wide range of professional conduct, including trial strategy. *Id.* at 689. To prove

prejudice, the defendant must show "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *Id.* at

694. But on habeas review, the Court does not examine whether the elements of

*Strickland* have been met. *Harrington v. Richter,* 562 U.S. 86, 101 (2011). Instead, the

pivotal question is whether the state court's application of *Strickland* was reasonable.[2]
*Id.* The Court should answer this question affirmatively.

First, the court found that Ms. Bruno's decision to not introduce the videotape was a "strategic decision[]." (ECF No. 13-4:2). In evaluating a claim of ineffective assistance of counsel, counsel is "strongly presumed to have rendered adequate assistance. . . . and strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Here, the record shows that trial counsel knew about the videotape, but chose not to use it. (Trial Tr. Vol. III 73-74). Perhaps, as suggested by the Respondent, Ms. Bruno chose to exclude the videotape because she did not want the jury to see the victim's young motherless child which might have elicited sympathy from the jury and been more harmful to Ms. Sosa. *See Harrington v. Richter*, 562 U.S. 89, 108 (2011) ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."). Regardless of the reason that trial counsel chose not to introduce the videotape, however, the OCCA's rejection of

---

[2]  In his direct appeal brief, Mr. Sosa submits the transcript excerpt, citing the full DVD video which was submitted as Exhibit A to Petitioner's Rule 3.11 Motion to Supplement the Record. (ECF No. 1-1:17-20). In the OCCA Summary Opinion denying the claim, the appellate court noted that it would not consider the full video in deciding the substantive merits of the ineffectiveness claim. (ECF. No. 13-4:2, n.1). However, the court did state that it would consider the excerpt. (ECF No. 13-4:2, n.1). Under these circumstances, the OCCA's review of the excerpt is considered a denial on the merits on the claim and will be accorded deference under the AEDPA. *See Wilson v. Sirmons*, 536 F.3d 1064, 1079 (10th Cir. 2008) ("Had the state court evaluated the non-record evidence in its denial of Mr. Wilson's *Strickland* claim and his request for an evidentiary hearing, we would apply AEDPA's deferential standard.").

Petitioner's claim based on "trial strategy" was a reasonable interpretation of, and consistent with, Supreme Court precedent.

Likewise, the OCCA found that Petitioner had failed to prove prejudice resulting from the videotape's omission because: (1) the tape was ambiguous and (2) other evidence existed to support the conviction. This rationale is consistent with Supreme Court precedent. (ECF No. 13-4:3).

First, the excerpt contains statements which are arguably inconsistent with M.A.'s prior testimony, which had been introduced through the testimony of her grandmother. However, the excerpt also contains statements which are consistent with M.A.'s prior statements. *See* ECF No. 1-1:18 (statement from M.A. that she thinks "Mom's boyfriend" "killed her."); ECF No. 1-1:19 (indicating that Mom's boyfriend was choking her). Contrary to Petitioner's argument, the statements do not clearly contradict M.A.'s statements she had made to her grandmother only hours after the murder. These statements, without more, are insufficient to establish that if counsel had introduced the videotape, Petitioner would have likely been exonerated. The OCCA reached this conclusion, and that decision is consistent with and a reasonable application of *Strickland*.

Second, the OCCA reasonably concluded that Petitioner could not establish prejudice based on trial counsel's failure to introduce the videotape in light of other evidence which supported the conviction. *See Requena v. Roberts*, 278 Fed. Appx. 842, 848 (10th Cir. May 23, 2008) (unpublished op.) (affirming denial of habeas petitioner's

claim that trial counsel was ineffective for failing to subpoena a witness, stating that petitioner "would not be able to establish prejudice under *Strickland*" because sufficient other evidence existed to support the conviction). As a result, Petitioner is not entitled to habeas relief on Ground One.

## VI.     EVIDENCE OF OTHER CRIMES, WRONGS, ACTS

In Ground Two, Petitioner challenges the trial court's evidentiary ruling concerning the admission of "other crimes" evidence at his trial in the form of testimony from the victim's sister, Christina Macias. (ECF No. 1-1:19-24). Ms. Macias testified that approximately two weeks prior to her sister's death, she had moved in with Ms. Macias because Petitioner had been violent with her. (Trial TR. Vol. III 77-78). As evidence of the violence, Ms. Macias testified to seeing bruises and bite marks on her sister's face and back. (Trial TR. Vol. III 78). Ms. Macias also testified that she observed Petitioner throw a pair of earrings at her sister. (Trial TR. Vol. III 82). At a pretrial hearing, the trial court ruled the evidence as admissible under state law. (Pretrial TR. 56-57).

On direct appeal, the Petitioner alleged that the admission of the evidence violated his Due Process rights under the 5th and 14th Amendments. (ECF No. 1-1:25). In denying relief however, the OCCA applied only Oklahoma law. (ECF No. 13-4:4). As a result, this Court must review Ground Two *de novo. See Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) ("Although Knighton did raise this constitutional due process argument on direct appeal, the Oklahoma appellate court did not specifically address it. We, therefore, review this habeas claim *de novo.*").

In doing so, the dispositive question is whether the trial court's admission of Ms. Macias' testimony, considered in light of the entire record, resulted in a fundamentally unfair trial. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). This question, in turn, is answered by weighing the probative value of the evidence against the potential for prejudice. *See Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) ("[W]e will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law.") (citing *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998) (internal quotation marks omitted).

The trial court admitted Ms. Macias' testimony under *Burks v. State*, 594 P.2d 771 (Okla. Crim. App. 1979). There, the OCCA concluded that "[e]vidence of other offenses may be admissible where it tends to establish motive, intent, absence of mistake or accident, identity or a common scheme or plan which embraces the commission of two or more crimes so related to each other that proof of one tends to establish the other." *Id.* at 772. Admitting Ms. Macias' testimony that she had witnessed evidence of violence towards her sister tended to establish Mr. Sosa's intent and motive. Because the State had charged Mr. Sosa with first-degree murder, the State had to establish malice aforethought. *See* 21 O.S. §701.7. Evidence that Mr. Sosa had been previously violent toward the victim tended to show that he had possessed the requisite intent for the crime charged. *See Knighton*, at 1171 (rejecting similar habeas claim on *de novo* review, holding that evidence of other crimes was relevant to show

motive and intent and did not result in a fundamentally unfair trial). The Court should conclude that the probative value of the "other crimes" evidence clearly outweighed any potentially prejudicial effect. Accordingly, Petitioner is not entitled to habeas relief on Ground Two.

## VII. RECOMMENDATION

It is recommended that Mr. Sosa's Petition for Writ of Habeas Corpus **(ECF No. 1)** be **DENIED**.

## VIII. NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court by **June 2, 2016**, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

## IX. STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED on May 16, 2016.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE